1   ORIN SNYDER, *pro hac vice forthcoming*
2   OSnyder@gibsondunn.com
    GIBSON, DUNN & CRUTCHER LLP
3   200 Park Avenue
4   New York, NY 10166-0193
    Telephone: 212.351.2400
5   Facsimile: 212.351.6335

6
7   HOWARD HOGAN, *pro hac vice forthcoming*
    HHogan@gibsondunn.com
8   GIBSON, DUNN & CRUTCHER LLP
    1700 M Street, N.W.
9   Washington, D.C. 20036
10  Telephone: 202.887.3640
    Facsimile: 202.530.9550
11
12  ILISSA SAMPLIN, SBN 314018
    ISamplin@gibsondunn.com
13  GIBSON, DUNN & CRUTCHER LLP
14  333 South Grand Avenue
    Los Angeles, CA 90071
15  Telephone: 213.229.7354
16  Facsimile: 213.229.6354

17  *Attorneys for Defendant*

18              UNITED STATES DISTRICT COURT

19            CENTRAL DISTRICT OF CALIFORNIA

20  LOST INTERNATIONAL, LLC, a          CASE NO. 8:25-cv-00592-FMO-KES
21  California limited liability company,
                                         **OPPOSITION TO PLAINTIFF'S**
22              Plaintiff,               **MOTION FOR A PRELIMINARY**
                                         **INJUNCTION**
23        v.
                                         Date:    June 5, 2025
24  STEFANI JOANNE ANGELINA
25  GERMANOTTA, A.K.A. LADY              Action Filed:   March 25, 2025
26  GAGA, and DOES 1 through 100,        Trial Date:     No Date Set
    inclusive,
27
28              Defendants.

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. BACKGROUND ................................................................................................... 4

    A.    Lost Holds One of 193 "Mayhem" Trademarks ................................. 4

    B.    The Word "Mayhem" Reflects the Creative Process of Ms. Germanotta's Seventh Studio Album *Mayhem* ....................................... 7

    C.    Lost Files Its Injunction Motion ......................................................... 8

III. STANDARD ........................................................................................................ 8

IV. ARGUMENT ........................................................................................................ 9

    A.    Lost's Trademark Infringement Claims Are Meritless ........................... 9

        1.    The First Amendment Bars Lost's Claims ...................................... 9

        2.    Ms. Germanotta's Use of "Mayhem" Is Protected Fair Use ......... 11

        3.    Lost Does Not Own Any Rights in the Unregistered Stylization ................................................................................. 12

        4.    There Is No Likelihood of Reverse Confusion ............................. 13

    B.    Lost Has Not Demonstrated Irreparable Harm ..................................... 19

    C.    The Balance of Equities Weighs Against an Injunction .......................... 21

    D.    The Public Interest Weighs Against an Injunction ................................ 22

    E.    Lost's Proposed Injunction Is Overbroad and Vague ............................ 22

    F.    The Court Should Require Lost to Post Bond ........................................ 22

V. CONCLUSION ................................................................................................... 23

Gibson, Dunn & Crutcher LLP

OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

## Cases

*Adidas Am., Inc. v. Skechers USA, Inc.*,
  890 F.3d 747 (9th Cir. 2018) ........................................................................ 19

*Adir Int'l, LLC v. Unicomer S.A. de C.V.*,
  2007 WL 10094750 (C.D. Cal. Nov. 19, 2007) ............................................ 17

*Aliign Activation Wear, LLC v. Lululemon Athletica Can., Inc.*,
  2022 WL 3210698 (9th Cir. Aug. 9, 2022) ........................................... 16, 18

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) ........................................................................ 14

*Arenas v. Shed Media U.S. Inc.*,
  881 F. Supp. 2d 1181 (C.D. Cal. 2011) ........................................................ 22

*Bell v. Harley Davidson Motor Co.*,
  539 F. Supp. 2d 1249 (S.D. Cal. 2008) ................................................... 12, 13

*Cairns v. Franklin Mint Co.*,
  292 F.3d 1139 (9th Cir. 2002) ...................................................................... 11

*Caiz v. Roberts*,
  382 F. Supp. 3d 942 (C.D. Cal. 2019) .................................................... 10, 11

*CI Games S.A. v. Destination Films*,
  2016 WL 9185391 (C.D. Cal. Oct. 25, 2016) ............................................... 22

*Cohn v. Petsmart, Inc.*,
  281 F.3d 837 (9th Cir. 2002) ........................................................................ 15

*Cove USA v. No Bad Days Enters.*,
  2022 WL 423399 (C.D. Cal. Jan. 5, 2022) ................................................... 13

*Down to Earth Organics, LLC v. Efron*,
  2024 WL 1376532 (S.D.N.Y. Mar. 31, 2024) .............................................. 10

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
  983 F.3d 443 (9th Cir. 2020) ........................................................................ 11

*E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*,
  547 F.3d 1095 (9th Cir. 2008) ...................................................................... 10

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) ...................................................................... 15

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
  925 F. Supp. 2d 1067 (C.D. Cal. 2012) ........................................................ 14

*Glow Indus., Inc. v. Lopez*,
  252 F. Supp. 2d 962 (C.D. Cal. 2002) .................................................... 17, 21

*GS Holistic, LLC v. Nagi*,
   2025 WL 745826 (E.D. Cal. Mar. 7, 2025) ............................................................ 16

*Haas Automation, Inc. v. Steiner*,
   750 F. Supp. 3d 1107 (C.D. Cal. 2024) .............................................................. 10

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) .......................................................................... 19

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
   599 U.S. 140 (2023) .......................................................................................... 9

*JL Beverage Co. v. Beam, Inc.*,
   899 F. Supp. 2d 991 (D. Nev. 2012) ................................................................. 14

*JL Beverage Co. v. Jim Beam Brands*,
   828 F.3d 1098 (9th Cir. 2016) .......................................................................... 14

*LTTB LLC v. Redbubble, Inc.*,
   840 F. App'x 148 (9th Cir. 2021) ..................................................................... 13

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
   290 F. Supp. 2d 1083 (C.D. Cal. 2003) ............................................................ 18

*Mattel, Inc. v. MCA Recs., Inc.*,
   296 F.3d 894 (9th Cir. 2002) ....................................................................... 9, 10

*McGillvary v. Netflix, Inc.*,
   2024 WL 3588043 (C.D. Cal. July 30, 2024) ................................................. 10

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
   331 F. Supp. 2d 1214 (C.D. Cal. 2004) ....................................................... 14, 15

*New Milani Grp v. J.T. Bella, LLC*,
   2013 WL 12116579 (C.D. Cal. July 22, 2013) ............................................ 17, 20

*Olé Mexican Foods v. SK Market*,
   No. 2:24-cv-01877-WLH-BFM (C.D. Cal. May 13, 2025) ............................... 21

*Packman v. Chicago Trib. Co.*,
   267 F.3d 628 (7th Cir. 2001) ....................................................................... 11, 12

*Park L. Firm v. Park L. Offs., P.C.*,
   2020 WL 3213797 (C.D. Cal. Mar. 23, 2020) ................................................. 12

*Pepperdine Univ. v. Netflix, Inc.*,
   2025 WL 632983 (C.D. Cal. Feb. 26, 2025) ............................................ 9, 10, 11

*Pom Wonderful LLC v. Pur Bev. LLC*,
   2015 WL 10433693 (C.D. Cal. Aug. 6, 2015) ................................................. 20

*Price v. Stockton*,
   390 F.3d 1105 (9th Cir. 2004) .......................................................................... 22

*Punchbowl, Inc. v. AJ Press, LLC*,
   90 F.4th 1022 (9th Cir. 2024) ............................................................................ 9

*Ross v. Target Corp.*,
 2008 WL 11336378 (C.D. Cal. July 7, 2008) ........................................................ 15

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
 59 F.3d 902 (9th Cir. 1995) ..................................................................................... 20

*Servpro Indus. v. Zerorez of Phx. LLC*,
 339 F. Supp. 3d 898 (D. Ariz. 2018) ................................................................ 16, 19

*Skydiving Sch., Inc. v. GoJump Am.*,
 2025 WL 502491 (9th Cir. Feb. 14, 2025) ............................................................ 12

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
 987 F. Supp. 2d 1023 (C.D. Cal. 2013) ............................................................ 17, 18

*Surfvivor Media, Inc. v. Survivor Prods.*,
 406 F.3d 625 (9th Cir. 2005) ................................................................................... 18

*Tovey v. Nike, Inc.*,
 2014 WL 3510975 (N.D. Ohio July 10, 2014) ....................................................... 12

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
 610 F.3d 1171 (9th Cir. 2010) ................................................................................. 22

*Twentieth Century Fox Tele. v. Empire Distribution, Inc.*,
 875 F.3d 1192 (9th Cir. 2017) ................................................................................. 11

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ............................................................................................. 2, 8, 21

*WonderKiln, Inc. v. Snap, Inc.*,
 2022 WL 18397509 (C.D. Cal. Nov. 15, 2022) ..................................................... 19

*World Champ Tech LLC v. Peloton Interactive, Inc.*,
 2024 WL 665181 (N.D. Cal. Feb. 16, 2024) ............................................... 14, 15, 17

*Zamfir v. Casperlabs, LLC*,
 528 F. Supp. 3d 1136 (S.D. Cal. 2021) ................................................................... 21

**Statutes**

15 U.S.C. § 1125(c)(2)(C) .............................................................................................. 20

35 U.S.C. § 2 ................................................................................................................... 10

**Other Authorities**

Trademark Manual of Examining Procedure § 1202.08 (Nov. 2024) ........................... 10

# I. INTRODUCTION

Lost's motion for a preliminary injunction fails at every turn—it is dead on arrival and must be denied in full.  Lost does not own the word "mayhem."  It never has.  Trademark law does not—and cannot—give Lost, or any company, a monopoly over a common, dictionary word.  There are almost 200 registered or pending trademarks incorporating "mayhem," and countless businesses, entertainers, and brands have used "mayhem" on merchandise for decades, without challenge from Lost.

Lost knew of this widespread use when it chose the word for its niche surfboards and select apparel.  Lost then sat back for years as a prominent rock group, the Muppets, the Teenage Mutant Ninja Turtles, a monster truck, and numerous sports teams openly and publicly sold "mayhem" merchandise.  Lost never raised a word of protest—until now, when it uses this Court for a brazen publicity stunt aimed at Stefani Germanotta ("Lady Gaga"), a global and beloved icon whose blockbuster album and world tour use the word with full legal and artistic right.

Lost cannot show that any actual consumer would be confused enough to buy the wrong product—a fatal defect under any trademark theory.  Its own filing concedes that even surf enthusiasts, Lost's core market, understand there is no conceivable connection between the brands:

> "*[N]ot even a moron in a hurry would confuse these two brands.*"

(Dkt. 15-4 at 170.)

And the merchandise Lost complains most about—shirts sold at Walmart—are not licensed by or affiliated with Ms. Germanotta and would not be affected by the requested injunction.

Lost's total failure to establish immediate and irreparable harm dooms its motion.  This failure, standing alone, compels denial, as irreparable harm is the single most essential prerequisite for preliminary injunctive relief.  Speculation, conjecture, and conclusory assertions are legally insufficient—and that is all Lost offers.  Lost has presented no evidence—none—that it has suffered, or is likely to suffer, any actual harm

as a result of Ms. Germanotta's use of "mayhem" in connection with her album and tour merchandise. There is no sales data, no consumer surveys, no customer complaints, and no market analysis. Lost has not identified a single customer who has been misled or has declined to purchase Lost products due to any alleged confusion. To the contrary, Lost's own evidence confirms that even within its core customer base, there is recognition that no connection exists between Lost's niche surf brand and Ms. Germanotta's globally recognized music and merchandise, as demonstrated by one commentator's sarcastic response to Lost's case:



(Dkt. 15-4 at 178.)

Courts do not grant injunctions on speculation alone. Irreparable harm must be shown to be likely, not just possible. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 21 (2008). Lost has never once asserted exclusive rights to "mayhem" against the dozens of other brands, artists, and companies that have openly used the word on merchandise for years. Its sudden, selective attempt to weaponize trademark law solely against Ms. Germanotta is legally baseless and lays bare the opportunistic and manufactured nature of its claim.

*First*, **the First Amendment** categorically protects Ms. Germanotta's use of "mayhem" as the title of an expressive work. Under the well-established *Rogers* test, Lost cannot possibly show that the use lacks artistic relevance or explicitly misleads consumers.

*Second*, **the fair use doctrine** squarely shields Ms. Germanotta's descriptive use of "mayhem" in its ordinary, dictionary sense. The Lanham Act does not, and cannot, prevent artists from using common words to describe creative works.

*Third*, **the aesthetic functionality doctrine** flatly precludes Lost from claiming

exclusive rights over its unregistered, stylized use of "mayhem" for purely decorative and non-source identifying purposes. Trademark law does not allow monopolies over design elements that serve aesthetic, rather than brand-identifying, functions.

*Fourth*, even under a **traditional likelihood of confusion analysis**, Lost cannot prevail. There is no plausible argument—nor any evidence—that reasonable consumers would believe that Lost's niche surf merchandise originates from or is affiliated with Ms. Germanotta's Mayhem album and tour. Lost's own submissions confirm as much.

Because Lost cannot overcome even one of these independent legal bars—let alone all four—its motion collapses entirely. This fatal failure eliminates any possibility of success on the merits and further requires that the motion be denied.

*Finally*, **the balance of equities and the public interest** overwhelmingly favor Ms. Germanotta. She has invested extraordinary time, resources, and creative energy into the global release and promotion of her chart-topping Mayhem album and worldwide tour. Mayhem debuted at No. 1 on the Billboard 200 chart, earning both critical acclaim and commercial success. Samplin Ex. 8. Just days ago, Ms. Germanotta performed before an audience of 2.5 million people in Rio de Janeiro, a singular testament to the cultural magnitude and global reach of her work. Samplin Ex. 9. The public interest could not be clearer: to safeguard free artistic expression on this scale and to prevent the abuse of trademark law by a company that has never before asserted any exclusive right to "mayhem" against the many others who have openly used it for decades without objection. To enjoin an artist of Ms. Germanotta's stature at the height of a globally celebrated and record-breaking tour would be not only legally unjustified but a disservice to the public interest and a dangerous weaponization of the courts.

On this record, Lost's request does not merely fail—it fails conclusively on every element, under every legal theory, and in every factual respect. The complete absence of evidentiary support renders Lost's motion legally insufficient and requires denial as a matter of law.

## II.  BACKGROUND

### A.    Lost Holds One of 193 "Mayhem" Trademarks

The U.S. Patent & Trademark Office (PTO) lists 193 registered or pending trademarks that contain the word "mayhem."  Samplin Decl. ¶ 6.  Of those, 34 include the word "mayhem" for use on apparel.  *Id.* ¶ 7.  Examples include the logo of musician MADAME MAYHEM (Reg. No. 7,465,201) and "tees for and gifts for the edgy and unfiltered" from the brand MADNESS & MAYHEM (Reg. No. 6,701,823).  Samplin Exs. 4 & 30.   Sports-related brands with registered "mayhem" marks include the MACON MAYHEM, a Georgia hockey team that sells "tops as clothing" (Reg. Nos. 7,211,133; 7,233,898); the MIAMI MAYHEM volleyball team (Ser. Nos. 98/724,206; 98/724,174; 99/094,237); the MAYHEM BAIT CO fishing gear brand (Ser. No. 97/390,902); and jiu jitsu apparel brand MAYHEM ON THE MAT (Ser. Nos. 98/795,422; 98/805,517).  Samplin Ex. 4.  Car enthusiasts MAYHEM MOTORS have used the term for sweatshirts and t-shirts since 2014 (Reg. No. 5174336).  Samplin Exs. 4 & 32.  Lost owns one of the nearly 200 registrations and applications.  It owns a registration in the word "MAYHEM" in class 25 for use on "Beanies; Caps, Jackets, Pants; Sandals; T-Shirts; [and] Tank Tops."  Dkt. 15-4 at 9.  The registration is for the word mark only, without claim to "any particular font style, size, or color."  *Id.*

Outside the trademark database, countless other "mayhem" shirts and sweatshirts are available in the United States.  A sample of items available on Etsy, Threadless, Zazzle, and Spreadshirt are shown below:

  

Gibson, Dunn &
Crutcher LLP

OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION



Cox Exs. 108, 114, 269, 268, 228, 282, 295.

More importantly, there are already several other "Mayhem" brands that are much more prominent than Lost's and far better known to the consuming public. There is a well-known heavy metal rock band that has been touring and selling concert t-shirts since 1984—long before Lost obtained its trademark registration. Samplin Ex. 22. As shown below, the band's concert merchandise is readily available in the marketplace— including at Walmart, where Lost now claims its reputation is being harmed:



Samplin Ex. 1; Cox Exs. 254, 238, 253.

In addition, Jim Henson's Muppets have featured their own "Mayhem Band" since 1975, on *The Muppet Show* (1976-81), in *The Muppet Movie* (1979), and in other entertainment properties, including their own show, *The Muppets Mayhem* (2023). Samplin Ex. 29. As a result of that band's popularity, there are numerous apparel products available that feature the word "Mayhem":



Cox Exs. 119, 89, 143.

The term "Mayhem" also features prominently in apparel offered to promote (among others) the 2023 motion picture *Teenage Mutant Ninja Turtles: Mutant Mayhem*, to support Tampa's Rugby League team, and to promote a monster truck owned and promoted by Chistopher Koehler (Ser. No. 98/209,016), Samplin Ex. 31:



Cox Exs. 116, 309, 302.

Despite the number of other parties making conspicuous use of the word "mayhem," on March 11, 2025, Lost approached Ms. Germanotta with its demand that she alone cease use of "mayhem." Samplin Decl. ¶ 2. She responded on March 14, warning Lost of the weakness of its claims and explaining why it could not succeed. *Id.* ¶ 3. Lost did not substantively respond to the letter. *Id.* ¶ 4. Instead, Lost filed its complaint on March 25. Dkt. 1. Tellingly, it was not until ***after*** this suit was filed that Lost raised any concerns about other users of "mayhem." Samplin Ex. 1.

Despite his stated concern that Ms. Germanotta's use of "mayhem" will "irreversibly damage Lost's reputation," Lost's principal, Matt Biolos, has not shied

away from publicity since Lost filed suit.  Dkt. 15-2 ¶ 36; Samplin Ex. 13.  Days after Lost filed this action, Biolos was featured in a local news segment on the lawsuit. Samplin Ex. 14.  This bid for publicity revealed that even members of Biolos's own surf community see through Lost's claims.  One commenter on surf website BeachGrit wrote that Lost's claim is "utterly ridiculous" because "[a]ny core or casual surfers would understand the distinction between Lost's Mayhem clothing and Lady Gaga's Mayhem clothing."  Dkt. 15-4 at 170.

## B.    The Word "Mayhem" Reflects the Creative Process of Ms. Germanotta's Seventh Studio Album *Mayhem*

Stefani Germanotta—known professionally as Lady Gaga—is one of the world's bestselling musical artists, having sold an estimated 170 million records.  Samplin Ex. 6.  In late 2023, Ms. Germanotta began working on her seventh studio album.  Campbell Decl. ¶ 3.  As she has explained, the creative process for the album "was like pieces coming together," as she involved new collaborators and drew inspiration from genres ranging from "electro grunge" to "theatrical rock."  Samplin Ex. 16 at 3 & 17 at 10.  She decided to embrace the scattered approach and "[g]o with the chaos."  Samplin Ex. 16 at 3.

On January 27, 2025, Ms. Germanotta announced the title of the new album: *Mayhem*.  Samplin Ex. 7 at 1.  In an interview, Ms. Germanotta explained: "The album was called *Mayhem* to memorialize a piece of me and a piece of life that is not always easy to accept.... [I]t's all of the fractures of who we are and the fractures in the world and the mayhem of that brokenness that ultimately teaches us the power of joy." Samplin Ex. 17 at 9.  She has explained that *Mayhem* captures the album's simultaneous "vulnerability and aggression" (Samplin Ex. 15 at 3) and reflects that the album is a "blender of all [her] influences."  Samplin Ex. 17 at 10.  Reviewers have labeled the album "aptly named" (Samplin Ex. 18 at 3), referencing its "gore and carnage" (Samplin Ex. 19 at 3) and Ms. Germanotta's interest in "writ[ing] an album seeped in chaos, madness, heartbreak, and, well, *mayhem*."  Samplin Ex. 15 at 3.

1    To promote the album and tour, Ms. Germanotta released merchandise, including
2    t-shirts and sweatshirts, featuring dark, chaotic imagery and designs:

  

8    Fogerty Decl. ¶ 3 & Ex. 1 at 3–4.  She sells the vast majority of her merchandise on her
9    website and at her concerts.  *Id.* ¶ 4.    Nearly every piece references Lady Gaga or
10   incorporates an image of Ms. Germanotta into the design.  *Id.*  ¶ 7.

11   ## C.    Lost Files Its Injunction Motion
12
13       On May 8, 2025, Lost filed its motion, arguing that it is likely to prevail on its
14   Lanham Act claims and seeking to enjoin Ms. Germanotta from selling clothing and
15   headwear bearing the term "mayhem."  Dkt. 17.  Lost most prominently points to the
16   fact that "Mayhem" shirts are sold in Walmart, which Lost claims "will only expedite
17   the irreparable harm to Lost's reputation."  Dkt. 17 at 4.  But Ms. Germanotta did not
18   authorize and does not control the shirts cited in Lost's papers, which are being offered
19   by third-party merchants through Walmart's online store—not products that are acquired
20   and stocked by Walmart.  Fogerty Decl. ¶ 17.

21   ### III. STANDARD
22       A preliminary injunction is an "extraordinary remedy, never awarded as of right."
23   *Winter*, 555 U.S. at 24.  A plaintiff seeking a preliminary injunction must make a "clear
24   showing," supported by evidence, (1) that he is likely to succeed on the merits; (2) that
25   he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance
26   of equities tips in his favor; and (4) that an injunction is in the public interest.  *Id.* at 20,
27   22.

28

## IV. ARGUMENT

**A.    Lost's Trademark Infringement Claims Are Meritless**

      **1.    The First Amendment Bars Lost's Claims**

Lost cannot prevail on its claims because Ms. Germanotta's expressive use of "mayhem" is protected by the First Amendment. *See Pepperdine Univ. v. Netflix*, 2025 WL 632983, at *3 (C.D. Cal. Feb. 26, 2025). "[W]hen a trademark owner asserts a right to control how we express ourselves … applying the traditional [likelihood-of-confusion] test fails to account for the full weight of the public's interest in free expression." *Mattel v. MCA Recs.*, 296 F.3d 894, 900 (9th Cir. 2002). To avoid conflict between the First Amendment and the Lanham Act, the Ninth Circuit applies the *Rogers* test "in cases [like this one] where the allegedly infringing use of a trademark is part of an expressive work protected by the First Amendment." *Pepperdine*, 2025 WL 632983, at *3. When the defendant is not using the term at issue as a designation of source for her own goods but is instead using it as part of an expressive work protected by the First Amendment, *Rogers* applies, and the plaintiff cannot establish infringement without showing the defendant's use of the mark is either (1) not artistically relevant or (2) misleading as to the source or content of the mark. *Id.* at *3. Lost's motion does not mention *Rogers*—even though Ms. Germanotta raised it in her pre-suit correspondence and it bars Lost's claims.[1]

      ***Ms. Germanotta's Use of Mayhem Is Expressive, Not Source Identifying.*** Lost concedes that Ms. Germanotta uses "mayhem" as part of an expressive work and not as a source identifier. Dkt. 17 at 1, 6 (recognizing Ms. Germanotta's use as temporary, not identifying the source of any good, and conveying "messages and imagery"). After all, "[w]e expect a title [of an expressive work] to describe the underlying work, not to identify the producer." *Mattel*, 296 F.3d at 901. Accordingly, courts routinely analyze

---

[1]  Ninth Circuit opinions decided before *Jack Daniel's Props. v. VIP Prods.*, 599 U.S. 140 (2023), "remain[] intact and binding," where, as here, the accused use is expressive and not to designate source. *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1031 (9th Cir. 2024).

the use of a mark in the title of an expressive work under *Rogers*.  *E.g., McGillvary v. Netflix, Inc.*, 2024 WL 3588043, at *13 (C.D. Cal. July 30, 2024) (use of mark in documentary title was "not to identify its source but to identify its subject-matter"); *Haas Automation v. Steiner*, 750 F.Supp.3d 1107, 1118 (C.D. Cal. 2024) (use of mark on book cover told "consumer what the Book is about" not "who published the book or the source of the book").[2]

Rogers applies because there is "no question" that the underlying works—the album and tour—are "expressive work[s]" protected by the First Amendment.  *Haas*, 750 F.Supp.3d at 1118.  Ms. Germanotta uses "mayhem" to describe "what the [album] is about," *id.*, "its subject matter," and the "tone" of the album, *Down to Earth Organics v. Efron*, 2024 WL 1376532, at *4 (S.D.N.Y. Mar. 31, 2024).  Specifically, "mayhem" describes both the "chaotic" and "out of control" lyrical content of the album and the "genre-defying" mix of musical styles, *supra*, Section II.B, all of which contributes to the album's simultaneous "vulnerability and aggression,"  Samplin Ex. 15 at 3.

**Ms. Germanotta's Use of "Mayhem" Has Artistic Relevance & Does Not Explicitly Mislead.**  Lost cannot show that Ms. Germanotta's use of "mayhem" (1) is not artistically relevant to the underlying work or (2) explicitly misleads consumers as to the source or the content of the work.  *Pepperdine*, 2025 WL 632983, at *3.

Prong 1.  The artistic relevance of the word "mayhem" is beyond dispute, as Ms. Germanotta uses the term to describe the underlying album.  *See E.S.S. Ent. 2000, Inc. v. Rock Star Videos*, 547 F.3d 1095, 1099–1100 (9th Cir. 2008) (artistic relevance must be "merely … above zero"); *Caiz v. Roberts*, 382 F.Supp.3d 942, 949 (C.D. Cal. 2019) (rap artist Rick Ross's use of "mastermind" in album title had artistic relevance given the "larger, abstract theme" of "masterminds" in hip-hop).

Prong 2.  Lost has not identified any instance in which Ms. Germanotta has made any "explicit indication, overt claim, or explicit misstatement" identifying Lost as the source of her goods.  *Dr. Seuss Enterprises v. ComicMix*, 983 F.3d 443, 462 (9th Cir.

---

[2]   The title of "a single creative work" cannot be registered as a trademark.  *See* Trademark Manual of Examining Procedure § 1202.08 (Nov. 2024); 35 U.S.C. § 2.

2020). Rather, her album credits, advertising, and merchandise "confirm" that *she* is "responsible for" the album. *Pepperdine*, 2025 WL 632983, at *4–5 (use of mark not explicitly misleading where Netflix series' title cards identified entities "responsible for the series"); Campbell Decl. ¶ 4.

**The Rogers *Test Applies to Promotional Merchandise.*** The Ninth Circuit has held that "promotional efforts" associated with an expressive work are also governed by *Rogers*. *Twentieth Century Fox v. Empire Dist.*, 875 F.3d 1192, 1196–97 (9th Cir. 2017); *see Caiz*, 382 F.Supp.3d at 952 (promotional efforts entitled to protection under *Rogers*). Because Ms. Germanotta's use of "mayhem" in connection with her album and tour are protected under *Rogers*, her use of "mayhem" on promotional materials, like concert t-shirts, is also protected.

## 2. Ms. Germanotta's Use of "Mayhem" Is Protected Fair Use

Lost cannot prevail on its claims for the independent reason that Ms. Germanotta's use of "mayhem" is protected under the Lanham Act's fair use defense, which permits a junior user "to use a descriptive term in good faith in its primary, descriptive sense other than as a trademark." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002). A defendant must show: (1) its "use of the term is not as a trademark or service mark"; (2) it "uses the term 'only to describe its goods or services'"; and (3) it "uses the term 'fairly and in good faith.'" *Id.* at 1151. Each element is easily met here.

*First*, Ms. Germanotta is not using "mayhem" "as a mark" and Lost does not contend otherwise. Ms. Germanotta is not using "mayhem" to identify the source of any goods or services; instead, she has identified herself as the source of the *Mayhem* album, associated tour, and merchandise. *See, e.g.*, *Packman v. Chicago Trib. Co.*, 267 F.3d 628, 639–40 (7th Cir. 2001) (use of mark on commemorative t-shirts deemed fair where source was prominently identified). In fact, the words "LADY GAGA" or "GAGA," Ms. Germanotta's face, or both "prominently appear[]" where her merchandise is sold, "plainly indicating" she is the source. *Id*; Fogerty Decl. ¶ 6. The same is true for nearly all the merchandise. Fogerty Decl. ¶ 7. Further, as Lost recognizes, "mayhem" is simply

a "moment in time" for Lady Gaga, Dkt. 17 at 1, who has offered promotional merchandise for each of her seven studio albums. *See Bell v. Harley Davidson*, 539 F.Supp.2d 1249, 1258 (S.D. Cal. 2008) (term not source identifying where defendant did not use it "exclusively, but instead employ[ed] a wide variety of" slogans); Fogerty Decl. ¶ 15.

*Second*, Ms. Germanotta uses the word "mayhem" descriptively. The word "mayhem" indicates "any kind of chaos or disorder." Samplin Ex. 20 at 1. Lost cannot bar Ms. Germanotta from using the word in its dictionary sense. *See Skydiving Sch., Inc. v. GoJump Am.*, 2025 WL 502491, at *1 (9th Cir. Feb. 14, 2025) (plaintiff could not claim "an impermissible monopoly over the words that 'most efficiently and accurately describe[d]'" parties' services). Courts regularly reject trademark claims concerning the use of a word "to convey the emotions associated with" a product. *See, e.g.*, *Tovey v. Nike*, 2014 WL 3510975, at *14 (N.D. Ohio, July 10, 2014) (Nike's use of "boom" in advertising campaign to promote footwear was fair); *Bell*, 539 F.Supp.2d at 1258 (use of "ride hard" slogan was descriptive). Here, Ms. Germanotta chose the word "mayhem" as her album title because it describes the chaotic period in her life the music on the album captures.

*Third*, Ms. Germanotta is using "mayhem" in good faith because she did not adopt the title "intend[ing] to capitalize on [Lost's purported] good will." *Park L. Firm v. Park L. Offs., P.C.*, 2020 WL 3213797, at *5 (C.D. Cal. Mar. 23, 2020) (finding good faith where there was "no evidence … Defendants intended to create confusion or capitalize on the [plaintiff's] Marks"). Ms. Germanotta was not even aware of Lost's mark when she chose her album name. Campbell Decl. ¶ 9. And her inclusion of "Lady Gaga" and her image on merchandise further evidences she had no intent to create confusion or capitalize on Lost's purported goodwill. *See Bell*, 539 F.Supp.2d at 1259.

### 3. Lost Does Not Own Any Rights in the Unregistered Stylization

The doctrine of aesthetic functionality is a separate and independent bar to Lost's claims. Lost relies on the purported similarity between an unregistered, stylized version

"mayhem" it uses and the stylized version of "mayhem" on some of Ms. Germanotta's merchandise. Dkt. 17 at 6. The doctrine of aesthetic functionality bars trademark infringement claims where, as here, consumers buy goods because they find the mark aesthetically pleasing, not because the mark identifies the plaintiff (or defendant) as the source of the goods. *See LTTB v. Redbubble*, 840 Fed. App'x 148, 150–51 (9th Cir. 2021).

Lost "has presented no evidence" that consumers buy its apparel products "because the design associates the goods with the company [Lost] rather than because they want goods bearing the [word MAYHEM]." *LTTB*, 840 Fed. App'x at 151 ("LTTB could not preclude others from displaying the phrase ['Lettuce Turnip the Beet'] on products" where it presented no evidence that "consumers buy the goods because the marks identify LTTB as the source of the goods"); *see Cove USA v. No Bad Days Enters.*, 2022 WL 423399, at *3 (C.D. Cal. Jan 5, 2022) (evidence that claimant "sold millions of products" did "not support the contention that consumers purchase the products because they are source-identifying rather than merely aesthetically pleasing").

Ms. Germanotta also is not using "mayhem" as a source identifier. Rather, the source of her products is "Lady Gaga." The inclusion of "mayhem" on her merchandise is merely a decorative feature that commemorates this specific album and tour. Where a defendant's "use of the mark is a decorative feature of their merchandise and is not source-identifying," the use is, "as a matter of law … aesthetically functional use, and not a source-identifying trademark use; such uses are not infringing." *Fleischer Studios v. A.V.E.L.A., Inc.*, 925 F.Supp.2d 1067, 1074–75 (C.D. Cal. 2012).

### 4. There Is No Likelihood of Reverse Confusion

Lost's claims fail on a fourth, independent ground—under the likelihood of confusion analysis. Lost relies on a reverse confusion theory, which requires it to prove that Ms. Germanotta "is using [MAYHEM] in a way that is likely to confuse [Lost's] customers into believing that they are dealing with [Lady Gaga]." *Moose Creek v. Abercrombie & Fitch*, 331 F.Supp.2d 1214, 1221 (C.D. Cal. 2004). Lost's theory is that

people who encounter Lost's merchandise where it is sold—either on its website or at one of the "limit[ed]" shops that sells Lost's surfboards (Dkt. 15-2 at ¶ 17)—will mistakenly believe that Lost's merchandise is Lady Gaga merchandise.  This theory is nonsensical, and Lost's own consumer base has remarked that "[n]ot even a moron in a hurry would confuse these brands." Dkt 15-4 at 164.  That commonsense conclusion is confirmed by applying the factors from *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

Factor 1: Strength of the Mark.  Lost has not shown its asserted mark is conceptually or commercially strong enough to support a claim of reverse confusion.  If plaintiff's mark "ha[s] very little strength for the defendant's product … to overtake, reverse confusion must be unlikely." *World Champ Tech LLC v. Peloton Interactive*, 2024 WL 665181, at *15 (N.D. Cal. Feb. 16, 2024).

A mark's conceptual strength relates to the "obviousness of its connection to the good or service to which it refers." *JL Beverage Co. v. Jim Beam Brands*, 828 F.3d 1098, 1107 (9th Cir. 2016).  But in "a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd." *JL Beverage Co. v. Beam, Inc.*, 899 F.Supp.2d 991, 1000 (D. Nev. 2012).  "Even an arbitrary mark may be classified as weak where there has been extensive third party use of similar marks on similar goods." *Moose Creek*, 331 F.Supp.2d at 1224 (refusing to enjoin defendant from selling apparel bearing "moose" because defendant "proffered substantial evidence, in the form of internet advertisements, that demonstrate[d] that many retailers [were] selling clothing bearing" the same word).  Where, as here, "the marketplace is replete with products using a particular trademarked word indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will *not* be confused." *EMI v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002).

PTO records show there are almost 200 pending or registered marks that incorporate the term "mayhem," and 34 of them are for apparel products.  Samplin Decl. ¶¶ 6–7.  A limited internet investigation uncovered more than 300 apparel products that

1  bear the word "mayhem." Cox Decl. ¶¶ 4–5. Lost "lacks sufficient mark strength" to

2  support a claim of reverse confusion. *World Champ Tech*, 2024 WL 665181, at *16.

3      <u>Factor 2: Similarity</u>. The parties' uses of "mayhem" are dissimilar because

4  "consumers will actually encounter [them] differently in the marketplace." *Cohn v.*

5  *Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002). It is not enough that marks might be

6  "nearly identical" when "viewed in isolation." *Ross v. Target Corp.*, 2008 WL

7  11336378, at *7 (C.D. Cal. July 7, 2008). Instead, "[m]arks should be considered in

8  their entirety and as they appear in the marketplace." *EMI*, 279 F.3d at 1144.

9      Lost's mark is visually distinct from Ms. Germanotta's use of "mayhem" on her

10  merchandise, and thus unlikely to be confused for her merchandise, because the word

11  "LOST" is "prominently feature[d]" next to its MAYHEM mark in the marketplace.

12  *Moose Creek*, 331 F.Supp.2d at 1227.

13      Lost's "MAYHEM" apparel is sold under the banner "LOST BY MAYHEM" on

14  its website. Samplin Ex. 23. Outside its website, Lost "purposefully limits the

15  distribution of MAYHEM clothing and merchandise to core retailers who sell their

16  surfboards and embody the niche surf counter-culture" (Dkt. 15-2 ¶ 17), where anyone

17  shopping would know that surf-related goods—not pop music merchandise—are sold.



Samplin Exs. 24–25.

24      Likewise, Ms. Germanotta's merchandise is "typically accompanied by … the

25  dominant and distinctive" Lady Gaga name in the marketplace, "further diminishing any

26  likelihood of confusion." *Aliign Activation Wear v. Lululemon Athletica*, 2022 WL

27  3210698, at *1 (9th Cir. Aug. 9, 2022). Ms. Germanotta's advertisements for products

28

displaying the word "mayhem" "also contain[] [her] own name and other" identifiers. *Servpro Indus. v. Zerorez of Phx.*, 339 F.Supp.3d 898, 907 (D. Ariz. 2018). Ms. Germanotta sells almost all her merchandise on her website, "ladygaga.com," or on her concert tour; neither venue leaves any doubt of the source of the goods. Fogerty Decl. ¶ 4 , 6 & Ex. 2. And nearly every piece of Ms. Germanotta's *Mayhem* apparel is accompanied by her distinctive name, image, or both:

   

Fogerty Decl. ¶ 6 & Ex. 1.

Lost says Ms. Germanotta uses "mayhem" "in the same or strikingly similar stylization on t-shirts and sweatshirts sold on her website." Dkt. 17 at 15. This is the kind of "conclusory statement" that "do[es] not suffice." *GS Holistic v. Nagi*, 2025 WL 745826, at *6 (E.D. Cal. Mar. 7, 2025). Lost relies on an image of one sweatshirt bearing one stylized version of "mayhem" and fails to acknowledge that much of the merchandise it seeks to enjoin *does not feature* that stylization:

   

Fogerty Decl. ¶ 8 & Ex. 1. Lost does not disclose that it also uses different stylizations of the word MAYHEM, further undercutting its argument:

  

Samplin Exs. 26–28.

Even in isolation, the version of Ms. Germanotta's "mayhem" design identified by Lost is visually distinct from Lost's. Ms. Germanotta uses a "distinctive typeface" to create a design that appears messy, hand-scrawled, and compressed; Lost's appears in different "coloring" and features a more stretched-out design. *See Glow Indus. v. Lopez*, 252 F.Supp.2d 962, 996–97 (C.D. Cal. 2002). Lost admits Ms. Germanotta's mark creates a different overall impression and "depicts a dark aesthetic with gothic influences," unlike Lost's "surf counter-culture" identity. Dkt. 17 at 6. Such "differences in brand identities … support[] the conclusion that consumers are unlikely to be confused." *Stonefire Grill v. FGF Brands*, 987 F.Supp.2d 1023, 1053– (C.D. Cal. 2013).

Factor 3: Actual Confusion. There is no evidence of actual confusion. Lost's evidence of "a few instances of purported confusion" fails to show actual confusion. *Adir v. Unicomer*, 2007 WL 10094750, at *12 (C.D. Cal. Nov. 19, 2007). Lost cites comments on articles about the lawsuit—not spontaneous examples of people making incorrect purchasing decisions. If anything, Lost's evidence discussed above suggests its audience is *not* confused at all.

Factor 4: Defendant's Intent. As discussed, there is no evidence that Ms. Germanotta intended to infringe Lost's mark. Lost presents no argument regarding this factor and provides "no evidence to substantiate" its allegations of intent. *New Milani Grp v. J.T. Bella*, 2013 WL 12116579, at *15 (C.D. Cal. July 22, 2013).

Factor 5: Marketing Channels.  "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *World Champ Tech*, 2024 WL 665181, at *12. Where, as here, a plaintiff "sells its products primarily through its own website," and has "limited distribution," the "near absence of any overlap in marketing or distribution channels weighs heavily against a finding that reverse confusion is likely here." *Aliign*, 2022 WL 3210698, at *1.  Lost "purposefully limits the distribution of MAYHEM clothing and merchandise to core retailers who sell their surfboards and embody the niche surf counter-culture." Dkt. 15-2 ¶¶ 17–18.  By contrast, Ms. Germanotta primarily sells her apparel onsite at her live concerts.  Fogerty Decl. ¶ 4.

Nor do the parties target the same kind of consumer.  Lost caters to a "niche surf counter-culture" and considers the "core surf community" its "target audience."  Dkt. 15-2 ¶¶ 15, 26.  Ms. Germanotta's goods are targeted to fans of her music.  Campbell Decl. ¶ 10; Samplin Exs. 10–11.  "While [Lost] may subjectively believe that it competes with [Ms. Germanotta], it has not produced any evidence that it does." *Stonefire Grill*, 987 F.Supp.2d at 1055.

Factor 6: Relatedness of the Goods.  "[T]he mere fact that two products or services fall within the same general field" fails to create a likelihood of confusion. *Matrix Motor Co. v. Toyota*, 290 F.Supp.2d 1083, 1092 (C.D. Cal. 2003).  Here, although both parties offer shirts, they are not competitive.  Customers buy Lady Gaga shirts because they want to be associated with her music.  Campbell Decl. ¶ 10.  Lost's customers want apparel to associate with Lost's primary product—surfboards. Dkt. 15-2 ¶ 17.  Because consumers are unlikely to conclude that concert t-shirts and surf gear "come from the same source," the products are not "related" for the purpose of evaluating likelihood of confusion. *Surfvivor Media v. Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005) (relatedness factor favored defendant, even though both parties sold apparel).

Factor 7: Degree of Consumer Care.  In a reverse confusion case, courts consider the degree of care exercised by the alleged senior user's customers only. *Matrix Motor*,

OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

290 F.Supp.2d at 1095.  Here, Lost caters to a consumer base that exercises substantial care when purchasing the goods Lost sells.  Lost's goods are only available on its website and in a "limit[ed]" network of stores that also carry Lost's surfboards and align with its cultural values.  Dkt. 15-2 ¶ 17.  What's more, sellers of Lost's products claim that "[c]ustomers in [their] communit[ies] recognize Lost and its 'Mayhem' mark for its distinct connection to the niche surf counter-culture."  *E.g.*, Dkt. 15-10 ¶ 3.  "[O]ne would expect that consumers would exercise a high level of care before purchasing anything from [Lost]"—certainly enough care to understand that they are not purchasing from a popular musician.  *Aliign*, 2022 WL 3210698, at *2.

Factor 8: Likelihood of Expansion.  There is no likelihood of expansion of product lines.  Whether Ms. Germanotta intends to produce *Mayhem*-related "tank tops and sweatpants" is beside the point; this factor asks whether Ms. Germanotta "will expand [her] business to compete with the mark holder."  *Servpro*, 339 F.Supp.3d at 910.  Ms. Germanotta has no interest in selling surf gear.  Campbell Decl. ¶ 14.

## B.    Lost Has Not Demonstrated Irreparable Harm

Lost says it is entitled to a presumption of harm.  Dkt. 17 at 18.  That is wrong. Lost's failure to show a likelihood of success on the merits means there is no presumption.  *See WonderKiln v. Snap*, 2022 WL 18397509, at *3 (C.D. Cal. Nov. 15, 2022).

As a fallback, Lost asserts that "Lady Gaga's continued infringement will cause actual and significant irreparable harm to Lost" (Dkt. 17 at 18), but presents no evidence in support.  "[U]nsupported and conclusory statements regarding harm [a movant] might suffer" will not suffice for preliminary injunctive relief.  *Herb Reed Enters. v. Fla. Ent. Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see Adidas Am. v. Skechers USA*, 890 F.3d 747, 760 (9th Cir. 2018) (reversing injunction because plaintiff's allegation that defendant "harmed [plaintiff's] ability to control its brand image" was insufficient).

*First*, Lost relies on a single comment left on an Instagram post, purportedly by a Lost customer stating that *if* he gets mistaken for a Lady Gaga fan, he will stop wearing

OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

his MAYHEM shirt.  Dkt. 17 at 19.  This comment is inadmissible and speculative, as the commenter does not suggest that anyone *has*, in fact, been confused.  And there is no indication that it is representative.  *See New Milani*, 2013 WL 12116579, at *20 (denying injunction as plaintiff "failed to show that the comments are representative of consumers' opinions of [Defendant] generally").

*Second*, Lost states that "many surf lifestyle companies … have been driven into bankruptcy because they sold their clothing at mainstream stores."  Dkt. 17 at 19.  This purported risk of bankruptcy is completely speculative and unsupported by the article Lost cites, which explains that the bankruptcies were caused by "a rapid and dramatic rise in interest rates, persistent inflation, supply chain delays, a decline in customer demand …, shifting consumer preferences, and substantial fixed costs."  Samplin Ex. 21.  Lost also relies on the self-serving declarations of its owners, but "[a]ttestations from persons in close association and intimate contact with (the trademark claimant's) business do not reflect the views of the purchasing public."  *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995).  For this reason, courts regularly disregard claims of reputational harm by a plaintiff's employee.  *E.g.*, *Pom Wonderful v. Pur Bev.*, 2015 WL 10433693, at *11 (C.D. Cal. Aug. 6, 2015).

*Third*, Lost claims that Ms. Germanotta's tour "will certainly erode and tarnish Lost's … brand and goodwill" and "prevent Lost from having active control over … its reputation," and that her album "may even hinder Lost's ability to recruit athletes and acquire investors."  Dkt. 17 at 19–20.  Lost provides no evidence for these speculative claims.  Moreover, tarnishment is not a viable theory of unfair competition or trademark infringement, but rather is a theory of trademark dilution—a separate claim that Lost asserted in its initial complaint and then withdrew in its amended complaint because it only applies to the nation's most famous marks.  *See* 15 U.S.C. § 1125(c)(2)(C); *compare* Dkt. 1, *with* Dkt. 14.

**C.    The Balance of Equities Weighs Against an Injunction**

The balance of equities tips sharply in favor of Ms. Germanotta.  A preliminary injunction prohibiting Ms. Germanotta from using "mayhem" on her merchandise would cause significant harm.  In preparation for the tour, roughly 60,000 units of 31 types of merchandise, including clothing and headwear, have been printed and shipped.  Fogerty Decl. ¶ 10.  Thousands of hours and millions of dollars have already been invested in this merchandise, and it would be highly burdensome, costly, and environmentally harmful to reproduce it without the word "mayhem." *Id.* ¶ 11.  Further, an injunction prohibiting Ms. Germanotta from including the word "mayhem" on merchandise would severely hamstring her ability to promote her album or tour.  *See Zamfir v. Casperlabs*, 528 F.Supp.3d 1136, 1152–53 (S.D. Cal. 2021) (balance of equities tipped towards defendant, who "ha[d] publicly used the name for months").  Enjoining the sale of "mayhem" merchandise will cause millions of dollars of harm in sales of the merchandise, destruction of existing merchandise, and impaired ability to promote the album and tour.  Campbell Decl. ¶ 13; *see* Dkt. 37, *Olé Mexican Foods v. SK Market*, No. 2:24-cv-01877-WLH-BFM, at *10–12 (C.D. Cal. May 13, 2025).

Lost tries to dismiss these harms by arguing that Ms. Germanotta will "be successful in anything she does, regardless of the mark she uses" and that she deserves any harm because she is infringing.  Dkt. 17 at 21.  But the cases Lost cites involved instances of intentional, bad faith infringement.  They do not apply here, where Ms. Germanotta picked a dictionary term for her album name and was not aware of Lost's mark.  Moreover, the standard is not whether Ms. Germanotta will be successful in other fields.  Damage to each party is measured as "the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.  Courts routinely hold that the balance of equities tips in favor of the defendant in reverse confusion cases where, as here, the plaintiff fails to show irreparable harm and the defendant demonstrates potential loss of significant investment.  *E.g.*, *Glow*, 252

OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Gibson, Dunn & Crutcher LLP

F.Supp.2d at 1004–05 (balance of equities favored defendant Jennifer Lopez in reverse confusion case).

**D.    The Public Interest Weighs Against an Injunction**

The public interest weighs heavily against an injunction.  Courts "consistently recognize[] the significant public interest in upholding First Amendment principles" and refuse to enjoin expressive works, *Arenas v. Shed Media U.S. Inc.*, 881 F.Supp.2d 1181, 1195 (C.D. Cal. 2011), because "[t]he public has a significant interest in protecting free expression and ensuring that authors may title their work as they see fit." *CI Games v. Destination Films*, 2016 WL 9185391, at *15 (C.D. Cal. Oct. 25, 2016).

**E.    Lost's Proposed Injunction Is Overbroad and Vague**

"[A]n injunction must be narrowly tailored … to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).  The requested injunction is overbroad because it seeks to enjoin *all* merchandise that includes the word "mayhem." Dkt. 15-5 at 2.  Any injunction must be limited to the merchandise that Lost shows likely infringes. Here, there is no plausible argument that merchandise bearing "mayhem" that also features "Lady Gaga" or "Gaga" and/or images of Ms. Germanotta infringe Lost's mark. *See supra* p. 16.  Nor does Lost argue that Ms. Germanotta's merchandise bearing the non-stylized version of "mayhem," *supra* pp. 16–17, is infringing.  Injunctions prohibiting a defendant from offering products that "on their face dispel any confusion as to sponsorship or endorsement," like the one Lost seeks, are "plainly overbroad." *Toyota v. Tabari*, 610 F.3d 1171, 1176–77 (9th Cir. 2010).

**F.    The Court Should Require Lost to Post Bond**

The Court does not need to address whether a bond is required because no injunction should issue.  If the Court reaches the issue, Rule 65(c) provides that a court may issue an injunction only if the moving party gives security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Ms. Germanotta will lose millions if she

is enjoined from selling her "mayhem" merchandise at her tour, as the merchandise—most of which is earmarked to be sold at concerts—has already been manufactured and shipped.  Fogerty Decl. ¶ 14.  Any bond should be set at a minimum of $10 million.

## V. CONCLUSION

Lost's motion should be denied.

Dated:  May 15, 2025

GIBSON, DUNN & CRUTCHER LLP

By:  _____ /s/ Ilissa Samplin _____
Orin Snyder
Howard Hogan
Ilissa Samplin

*Attorneys for Defendant Stefani Germanotta*

OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Gibson, Dunn & Crutcher LLP

1

### CERTIFICATE OF COMPLIANCE

2         The undersigned, counsel of record for Defendant, certifies that this brief contains

3    6,906 words, which complies with the word limit of L.R. 11-6.1.

4

5    Dated:  May 15, 2025

6                                                        By:  _____/s/ Ilissa Samplin_____

7                                                              Ilissa Samplin

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28